UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARCUS HAND | : |
| vs. | : |
| | : NO. 4:18-CV-01287 |
| BARBARA ARENTZ | : |

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT BARBARA ARENTZ'S MOTION FOR SUMMARY JUDGMENT**

Now comes Defendant Barbara Arentz, by and through her attorneys, Weber Gallagher Simpson Stapleton Fires & Newby LLP, having concurrently filed a Motion for Summary Judgment, and in support thereof now submits the following Statement of Material Facts pursuant to Local Rule 56.1:

1. During the course of discovery, counsel for the Defendant subpoenaed a complete copy of Plaintiff Marcus Hand's medical records from the Pennsylvania Department of Corrections, from July 2015 through January 2018. The undersigned counsel certifies that all records received related to Plaintiff's ophthalmological care are attached hereto and incorporated by reference as Exhibit "A."

2. Counsel for Defendant also subpoenaed a complete copy of Mr. Hand's medical records from off-site ophthalmologist Dr. Christopher Patitsas from July 2015 to present. Counsel certifies that all records received from Dr. Patitsas are attached hereto and incorporated by reference as Exhibit "B."

3. Counsel for Defendant also sent several subpoenas for a complete copy of Mr. Hand's medical records from Penn State Health Eye Center at Milton S. Hershey Medical Center/Dr. George Papachristou from July 2015 to present. However, as of the date of filing, counsel has not received the subpoenaed records.

4. On September 23, 2015, Plaintiff saw off-site ophthalmologist Joseph Sassani, MD of Penn State Milton S. Hershey Medical Center, who noted that Plaintiff had a history of glaucoma, and that while his right visual field was normal, he showed significant visual field loss in the left eye. Exhibit "A" at p. 47. *See also id.* at pp. 48-52. He also noted that Plaintiff had a failed trabeculoplasty[1] in the left eye. *Id.* at p. 52. Plaintiff reported photopsia,[2] so Dr. Sassani recommended referral to retinal specialist. *Id.* at pp. 47, 52. He also recommended a return visit in two months. *Id.* at p. 47. While Plaintiff's intraocular pressure ("IOP") was within the normal range (18 in right and 20 in left),[3] Dr. Sassani believed that his left IOP was "borderline" and "for the long-term probably should be lower." *Id.* at pp. 47, 52.

5. Plaintiff complained of left eye burning, itching, and redness on October 3, 2015 to April Long, RN. Exhibit "A" at p. 96. Nurse Long added

---

[1] A laser treatment for glaucoma to alleviate pressure. https://www.webmd.com/eye-health/need-glaucoma-surgery#1
[2] Eye floaters or flashes. https://www.healthline.com/health/photopsia#definition
[3] Intraocular pressure is the measure of pressure inside the eye. Normal eye pressure generally ranges from 10-22 millimeters of mercury (mm Hg). High IOP is a risk factor for glaucoma. https://www.glaucoma.org/gleams/high-eye-pressure-and-glaucoma.php; https://www.glaucoma.org/treatment/hypotony.php

Plaintiff to the prison's urgent care line to be seen the following day. *Id.* He reported experiencing similar symptoms several months earlier. *Id.*

6. The next day, Plaintiff saw Mark McConnell, PA-C, who observed yellow crusting. Exhibit "A" at p. 96. Mr. McConnell performed an exam, and prescribed Gentamicin drops and follow-up the next day. *Id.*

7. Plaintiff reported that his eye felt better on October 5, 2015. Exhibit "A" at p. 93. Mr. McConnell opined that Plaintiff had conjunctivitis. *Id.* Mr. McConnell discussed this with Plaintiff, and told him to follow-up as scheduled or as needed. *Id.* The same day, Kevin Kollman, MD ordered a consult with the retinal specialist per Dr. Sassani's September 23, 2016 recommendation, and a follow-up with Dr. Sassani in two months. *Id.* at pp. 93, 118.

8. Plaintiff had an off-site appointment with Dr. Sassani on November 10, 2015. Exhibit "A" at p. 46. He continued to have photopsia in the left eye, but exam was negative for retinal detachment. *Id.* Dr. Sassani recommended two month follow-up. *Id.*

9. Plaintiff saw Dr. Sassani again on January 6, 2016. Exhibit "A" at pp. 43-45. Dr. Sassani noted that Plaintiff had recently seen Dr. Esther Bowie of the retinal service. *Id.* at p. 43. His IOP was 18 in each eye, and there was no evidence of inflammation. *Id.* Although there was central island in the left eye, exam

showed his visual field remained stable. *Id.* It was recommended that he continue his current prescriptions and return in four months. *Id.*

10. On January 11, 2016, Dr. Kollman ordered a four-month follow-up with Dr. Sassani. Exhibit "A" at pp. 94, 117.

11. Plaintiff again saw Dr. Sassani on April 28, 2016. Exhibit "A" at pp. 41-42. His IOP was 16 on the right and 20 on the left. *Id.* at p. 41. Dr. Sassani noted that Plaintiff had a failed filter and a surgical iridectomy[4] in the left eye. *Id.* Visual field examination showed general reduction in sensitivity in the right eye and marked constriction in the left. *Id.* He recommended having Plaintiff see Dr. George Papachristou of the glaucoma service in four to six weeks for consultation regarding possible further surgery, and returning to see him in three months. *Id.*

12. On June 15, 2016, Dr. Kollman referred Plaintiff to Dr. Papachristou for a one-day surgery to occur on August 2, 2016. Exhibit "A" at p. 34. Dr. Papachristou had recommended glaucoma drainage device placement in the left eye secondary to elevated IOP. *Id.*

13. On July 13, 2016, Dr. Kollman noted that Plaintiff was medically cleared for transfer secondary to an eye surgery consult. Exhibit "A" at p. 112.

---

[4] Removal of part of the iris as a treatment for glaucoma.
https://www.columbiaeye.org/education/digital-reference-of-ophthalmology/glacucoma/surgery-and-complications/peripheral-iridectomy

14. On or about July 28, 2016, Plaintiff was transferred from SCI-Huntingdon to SCI-Camp Hill. Exhibit "A" at p. 85.

15. On August 1, 2016, Plaintiff signed a notice, from Barbara Arentz, which stated that he was scheduled for a surgical procedure and would be admitted to the infirmary that day. Exhibit "A" at p. 26.

16. The following day, August 2, 2016, Plaintiff underwent left eye glaucoma surgery at Hershey Outpatient Surgery Center with Dr. Papachristou. Exhibit "A" at pp. 32-38.

17. Upon his return to the prison, Julian Gutierrez, MD noted that Plaintiff was status-post eye surgery at Hershey Medical Center, and that he had no complaints and was using his eye drops as recommended. Exhibit "A" at p. 86.

18. On the morning of August 3, 2016, Plaintiff reported to Shannon Quigley, RN that he was doing well. Exhibit "A" at p. 83. At noon that day, he stated that he was "ready to go" from the infirmary. *Id.* He was in no apparent distress and without complications, so he was discharged. *Id.* He had his eye shield on, and the nurse reviewed his drops including proper technique and directions for use, as well as activity restrictions. *Id.*

19. The same day he went off-site for a follow-up appointment. Exhibit "A" at p. 31. The ophthalmologist recommended activity restrictions, use of a

shield over eye at bedtime, use of several different eye drops, and returning in one week. *Id. See also id.* at pp. 39-40, 154-156.

20. Plaintiff returned to the off-site ophthalmologist on August 15, 2016 secondary to left eye glaucoma and drainage device placement. Exhibit "A" at p. 29. He recommended discontinuing Polytrim but otherwise continuing with the same drops, and following-up in two to three weeks. *Id.*

21. On August 15, 2016, Dr. Gutierrez discontinued Polytrim. Exhibit "A" at p. 156.

22. Plaintiff saw the on-site optometrist on August 17, 2016 for an exam and review of Plaintiff's medications and treatment plan. Exhibit "A" at p. 7.

23. On September 12, 2016, Plaintiff reported white cloudiness and inability to see out of his left eye. Exhibit "A" at p. 79. Judi Hamovitz, RN observed that Plaintiff's left eye sclera was slightly reddened, and there was a small bump (blister like) to the left of his pupil in the corneal region, which Plaintiff reported was normal. *Id.* He denied pain, dizziness, headaches, or seeing shadows. His gait was steady. The nurse referred him to the doctor for evaluation. *Id.*

24. The next day Plaintiff saw Vanitha Abraham, MD, who noted that Plaintiff had glaucoma for many years. Exhibit "A" at p. 80. Inasmuch as Plaintiff complained of vision loss, Dr. Abraham referred him for a same-day off-site

consult. *Id.* at pp. 12, 80. The off-site ophthalmologist found that Plaintiff had hyphema (bleeding) of the left eye. *Id.* at p. 12. He was to increase prednisone drops to every hour while awake, and add Atropine twice daily, elevate the head of his bed to 45 degrees, wear a shield at night, and not take aspirin or NSAIDs. *Id.* It was also recommended that he return the following day. *Id.*

25. After his return to the prison on September 13, 2016, Plaintiff was put in the infirmary for 23-hour observation due to his restrictions, and the ophthalmologist's recommendations were ordered. Exhibit "A" at pp. 77, 80, 109. Plaintiff denied any vision changes or pain later that day, and was using his eye drops. *Id.* at p. 77.

26. On the morning of September 14, 2016, Plaintiff reported that he was good. Exhibit "A" at p. 78. He was able to administer his own eye drops with proper technique, and denied new or worsening symptoms. *Id.* Plaintiff had another off-site ophthalmology consult that day. *Id.* at pp. 19-20. The ophthalmologist observed hyphema of the left eye status-post glaucoma surgery. *Id.* at p. 20. The plan was to continue all other drops but stop Dorzolamide, and he recommended returning in two weeks. *Id.* He also recommended calling if condition worsened, and tapering prednisolone from three times per day down to twice per day. *Id.* Plaintiff was also examined by the on-site optometrist that day, who found that Plaintiff's IOP was well-controlled at 16 in the right eye and 12 in

the left. *Id.* at p. 22. Dr. Gutierrez ordered the medication changed recommended by the specialist. *Id.* at pp. 157-159.

27. Plaintiff was discharged from the infirmary on September 15, 2016 with restriction of no contact sports. Exhibit "A" at pp. 78, 106.

28. On September 30, 2016, Plaintiff saw Dr. Gutierrez and asked why he had a medical hold. Exhibit "A" at p. 75. Dr. Gutierrez explained that an ophthalmology follow-up was needed and had been scheduled, and Dr. Gutierrez wanted to see the ophthalmologist's recommendations before deciding on the medical hold. *Id.* Plaintiff had no other complaints. *Id.*

29. Plaintiff went to a follow-up appointment with the off-site ophthalmologist, Dr. Papachristou, on October 3, 2016. Exhibit "A" at p. 11. The consultant recommended several medications and returning in one month. *Id.*

30. On October 3, 2016, Dr. Gutierrez ordered the medications recommended by Dr. Papachristou. Exhibit "A" at pp. 160-161.

31. On October 18, 2016, Plaintiff saw Dr. Abraham for glaucoma follow-up. *Id.* at p. 76. She noted that his IOP was down to 7, and he had another ophthalmology appointment coming up. *Id.*

32. Plaintiff had an on-site ophthalmology consultation with Scott Hartzell, M.D. on November 1, 2016 secondary to glaucoma. Exhibit "A" at p. 9. His right IOP was 10 and left IOP 5. *Id.* It was recommended that he continue

Latanoprost (Xalatan) drops in both eyes nightly and Timolol Maleate (Timoptic) drops in the right eye twice per day. *Id.* It was also recommended that he have an IOP check in one month. *Id. See also id.* at pp. 162-163.

33. On November 21, 2016, Dr. Gutierrez entered an order discontinuing Plaintiff's medical hold. Exhibit "A" at pp. 105, 204.

34. Plaintiff saw on-site ophthalmologist Dr. Hartzell on January 4, 2017. Exhibit "A" at p. 211. His IOP was 13 in the right and 12 in the left. *Id.* He was to continue Latanoprost (Xalatan) drops in both eyes nightly and Timolol Maleate (Timoptic) drops in the right eye twice per day; and it was recommended that he follow-up in 3-4 months. *Id*

35. On or about January 5, 2017, Plaintiff was transferred back to SCI-Huntingdon. Exhibit "A" at p. 69.

36. In his transfer reception screening, it was noted that Plaintiff has limited vision in the left eye. Exhibit "A" at p. 69. However, he was medically cleared for routine housing, employment, food handling, and activities. *Id.*

37. On January 6, 2017, Plaintiff reported that he was unhappy about not seeing the off-site ophthalmologist since October. Exhibit "A" at p. 69. Michael Gomes, PA-C reviewed Plaintiff's case with the doctor, and noted that there was no indication for referral to off-site ophthalmology unless deemed necessary by Institutional Eye Care ("IEC") (providers of on-site eye care). *Id.*

38.     Plaintiff underwent a visual acuity test on January 13, 2017. Exhibit "A" at p. 6. That day, he complained of more persistent left eye pain and worsening flashers and narrowing of visual field in his left eye for one week. Exhibit "A" at p. 70. On exam, pupillary response test was normal,[5] and extra-ocular movements ("EOMs") were intact. *Id.* There was no conjunctivitis. *Id.* Mr. Gomes discussed the case with the doctor, conducted patient education, and requested an ophthalmology referral. *Id.*

39.     Plaintiff saw off-site ophthalmologist Christopher J. Patitsas, MD on January 18, 2017, secondary to complaints of light flashes and some pain in the left eye. Exhibit "B" at pp. 3, 35. Dr. Patitsas opined that Plaintiff had stable combined mechanism glaucoma of the right eye, poor control of combined mechanism glaucoma of the left eye, and poor ability to view the fundus in the left eye. *Id.* He recommended continuing Timolol and Latanoprost drops, returning in 3-4 weeks for follow-up, and following up with Dr. Papachristou. *Id.*

40.     Plaintiff complained of left eye redness with some lid swelling and drainage, but without pain, on January 31, 2017. Exhibit "A" at p. 67. Michael Gomes opined that Plaintiff had left conjunctivitis. *Id.* He was to start erythromycin ointment. *Id.* He was to follow-up in three days. *Id.* at 105.

---

[5] This is documented in the medical records by the acronym "PERRLA," which stands for "pupils equal, round, reactive to light and accommodation" (i.e. normal response to pupillary test). https://www.healthline.com/health/perrla-eyes

41. On February 3, 2017, the conjunctivitis was resolving. Exhibit "A" at p. 67.

42. Plaintiff returned to see Dr. Patitsas on February 16, 2017. Exhibit "B" at pp. 4, 34. Dr. Patitsas noted improved control of Plaintiff's glaucoma in both eyes, and a cataract limiting vision in the left eye. *Id.* He was to continue with drops, and Dr. Patitsas planned to speak to Dr. Papachristou about the advisability of left eye extracapsular cataract extraction ("ECCE") and intraocular lens implantation ("IOL").[6] *Id.* He recommended return in three weeks. *Id.*

43. Plaintiff saw Dr. Patitsas again on March 10, 2017. Exhibit "B" at pp. 5, 33. Dr. Patitsas noted right eye glaucoma, with multiple peripheral anterior synechiae, and danger or angle closure; as well as cataract limiting vision in left eye. *Id.* He recommended YAG laser peripheral iridotomy ("LPI")[7] in the right eye, and ECCE/IOL in the left eye. *Id.* He discussed the risks and benefits with Plaintiff, who agreed to proceed with surgery. *Id.*

44. On April 4, 2017 Plaintiff underwent right eye surgery (YAG LPI procedure) with Dr. Patitsas, secondary to combined mechanism glaucoma with danger of angle closure. Exhibit "B" at pp. 6-7, 24. Several drops were recommended, and he was to return the following day. *Id.*

---

[6] Procedure for treatment of cataracts. https://www.insightvisioncenter.com/extracapsular-cataract-extraction-ecce/
[7] Laser procedure for treatment of narrow angle glaucoma. https://advancedeyecaremd.net/contact-us/yag-peripheral-iridotomy/

45. He returned to see Dr. Patitsas the following day, on April 5, 2017 secondary to mild uveitis glaucoma in the right eye. Exhibit "B" at pp. 8, 32. He was to continue Xalatan and Timolol drops, and use Pred Forte drops for six days. *Id.* He was to return for follow-up in 1-2 weeks. *Id.*

46. On April 11, 2017, Plaintiff had an on-site ophthalmology consult with Dr. Hartzell. Exhibit "A" at pp. 205-206. His right eye IOP was 15, and left IOP 12. *Id.*

47. Plaintiff saw Dr. Patitsas again on April 17, 2017. Exhibit "B" at pp. 9, 31. Dr. Patitsas noted resolved right eye uveitis glaucoma. *Id.* It was recommended that he continue the same drops, and return for the ECCE/IOL procedure to the left eye. *Id.*

48. Plaintiff had left eye cataract surgery (ECCE/IOL procedure) on May 9, 2017, which he tolerated well. Exhibit "A" at pp. 63-64; Exhibit "B" at pp. 11, 16-18. In the operative note, Dr. Patitsas noted preoperative diagnosis of cortical cataract, and secondary diagnoses of end-stage combined mechanism glaucoma; with history of failed glaucoma filter and successful tube shunt in the left eye; and a left, extremely miotic pupil, which made examination of the ocular fundus and ocular nerve disc almost impossible. Exhibit "B" at p. 16.

49. Plaintiff was admitted to the infirmary upon return to the prison. Exhibit "A" at p. 103.

50.  On May 10, 2017, Plaintiff saw Dr. Patitsas for a post-operative appointment. Exhibit "A" at p. 61; Exhibit "B" at pp. 10, 30. Dr. Patitsas noted that he was stable. Exhibit "B" at p. 30.  Several medications were recommended, and he was to avoid lifting, bending, or stooping; wear sunglasses during the day; and wear a protective patch over the left eye at bedtime. *Id.*

51.  On May 12, 2017, Dr. Patitsas noted "nice results" in Plaintiff's left eye. Exhibit "B" at pp. 12, 29.  He was to return in a week. *Id.*

52.  Plaintiff saw Dr. Patitsas again on May 19, 2017. Exhibit "B" at pp. 13, 28.  He again noted nice results in the left eye, and recommended several drops for both eyes. *Id.*

53.  On June 2, 2017, Plaintiff again saw Dr. Patitsas in follow-up. Exhibit "B" at pp. 14, 27. He continued to note good results in the left eye, and recommended several drops. *Id.* He also recommended following up with him or another ophthalmologist in a month. *Id.*

54.  On or about June 13, 2017, Plaintiff was received at SCI-Mahanoy from SCI-Huntingdon as a permanent transfer. Exhibit "A" at p. 59.

55.  The records show that Plaintiff continued to treat with both on-site and off-site ophthalmology for his glaucoma, and that his IOP remained controlled. *See* Exhibit "A" at pp. 5, 55, 58, 60, 102, 207-208, 209-210.

Respectfully submitted,

**WEBER GALLAGHER SIMPSON
STAPLETON FIRES & NEWBY, LLP**

By: _____
    Samuel H. Foreman, Esquire #77096
    sforeman@wglaw.com
    Caitlin J. Goodrich, Esquire #209256
    cgoodrich@wglaw.com
    Emily Ryan-Fiore, Esquire #318434
    eryan@wglaw.com

    WEBER GALLAGHER SIMPSON
    STAPLETON FIRES & NEWBY, LLP
    Four PPG Place, 5th Floor
    Pittsburgh, PA 15222
    (412) 281-4541
    (412) 281-4547 FAX

Date: May 13, 2020

# CERTIFICATE OF SERVICE

I, Caitlin J. Goodrich, Esquire, hereby certify that on this date a true and correct copy of the foregoing **STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was sent by first class United States mail, postage prepaid, to Plaintiff as follows:

> Smart Communications/ PA-DOC
> Marcus Hand, #AF-8748
> S.C.I.-Mahanoy
> PO Box 33028
> St. Petersburg, FL 33733
>
> All others via ECF

>               /S/ Caitlin J. Goodrich
> Caitlin J. Goodrich, Esquire

Dated: May 13, 2020