# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARCUS HAND,

       Plaintiff,

    v.

BARBARA ARENTZ,

       Defendant.

No. 4:18-CV-01287

(Judge Brann)

## MEMORANDUM OPINION

### FEBRUARY 11, 2021

Plaintiff Marcus Hand, an inmate incarcerated at the State Correctional Institution at Mahanoy in Frackville, Pennsylvania, filed an amended complaint pursuant to 42 U.S.C. § 1983 alleging an Eighth Amendment medical claim against Defendant Barbara Arentz, who is the clinical coordinator at the State Correctional Institution at Camp Hill, in Camp Hill, Pennsylvania.[1]  Presently before the Court is Defendant's motion for summary judgment,[2] which is ripe for adjudication.  For the reasons that follow, the Court will grant the motion in favor of Defendant Arentz and enter judgment against Plaintiff.

---

[1]   Doc. 27.
[2]   Doc. 47.

## I.     FACTUAL BACKGROUND

### A.     Allegations in the Amended Complaint

In the amended complaint, Plaintiff, who has a long history of glaucoma, alleges that Defendant Barbara Arentz, a clinical coordinator at SCI Camp Hill, failed to schedule two follow-up appointments with an off-site ophthalmologist in accordance with the ophthalmologist's recommendation.[3]  Plaintiff also alleges that Defendant Arentz was deliberately indifferent to his serious medical needs by falsely asserting that the Hershey Eye Center had released Plaintiff from their care, failing to arrange for his transfer back to his home institution, SCI Huntingdon, and failing to notify SCI Huntingdon about open or pending consults.[4]

### B.     Undisputed Material Facts

On September 23, 2015, Plaintiff saw off-site ophthalmologist, Joseph Sassani, M.D., at the Penn State Milton S. Hershey Medical Center, who noted that Plaintiff had a history of glaucoma, and that while his right visual field was normal, he showed significant visual field loss in the left eye.[5]  He also noted that Plaintiff had a failed trabeculoplasty in the left eye.[6]  Plaintiff further reported photopsia, so Dr. Sassani recommended a referral to retinal specialist.[7]  He also recommended a

---

[3]   *See generally* Doc. 27.
[4]   *See id.*
[5]   Doc. 59 at 2.
[6]   *Id.*
[7]   *Id.*

return visit in two months.[8]  Although Plaintiff's intraocular pressure ("IOP") was within the normal range (18 in the right and 20 in the left), Dr. Sassani believed that his left IOP was "borderline" and "for the long-term probably should be lower."[9]

Plaintiff complained to April Long, R.N. of left eye burning, itching, and redness on October 3, 2015.[10]  Nurse Long added Plaintiff to the prison's urgent care line to be seen the following day.[11]  He reported experiencing similar symptoms several months earlier.[12]  The next day, Plaintiff saw Mark McConnell, PA-C, who observed yellow crusting.[13]  Mr. McConnell performed an exam, prescribed Gentamicin drops, and a follow-up the next day.[14]

Plaintiff reported that his eye felt better on October 5, 2015.[15]  Mr. McConnell opined that Plaintiff had conjunctivitis.[16]  Mr. McConnell discussed this with Plaintiff and told him to follow-up as scheduled or as needed.[17]  The same day, Kevin Kollman, M.D., ordered a consultation with the retinal specialist per Dr. Sassani's September 23, 2016 recommendation and a follow-up with Dr. Sassani in two months later.[18]

---

[8]  *Id.*
[9]  *Id.*
[10]  *Id.*
[11]  *Id.* at 2-3.
[12]  *Id.* at 3.
[13]  *Id.*
[14]  *Id.*
[15]  *Id.*
[16]  *Id.*
[17]  *Id.*
[18]  *Id.*

Plaintiff had an off-site appointment with Dr. Sassani on November 10, 2015.[19]  He continued to have photopsia in the left eye, but was negative for retinal detachment.[20]  Dr. Sassani again recommended a two month follow-up.[21]  Plaintiff then saw Dr. Sassani on January 6, 2016.[22]  Dr. Sassani noted that Plaintiff had recently seen Dr. Esther Bowie of the retinal service.[23]  His IOP was 18 in each eye with no evidence of inflammation.[24]  Although there was a central island in the left eye, the exam showed that his visual field remained stable.[25]  It was recommended that he continue his current prescriptions and return in four months.[26]  On January 11, 2016, Dr. Kollman ordered a four-month follow-up with Dr. Sassani.[27]

Plaintiff again saw Dr. Sassani on April 28, 2016.[28]  His IOP was 16 on the right and 20 on the left.[29]  Dr. Sassani noted that Plaintiff had a failed filter and a surgical iridectomy in the left eye.[30]  An examination of the visual field showed general reduction in sensitivity in the right eye and marked constriction in the left.[31]  He recommended having Plaintiff see Dr. George Papachristou of the glaucoma

---

[19]  *Id.*
[20]  *Id.*
[21]  *Id.*
[22]  *Id.*
[23]  *Id.*
[24]  *Id.*
[25]  *Id.* at 3-4.
[26]  *Id.* at 4.
[27]  *Id.*
[28]  *Id.*
[29]  *Id.*
[30]  *Id.*
[31]  *Id.*

service in four to six weeks for a consultation regarding possible further surgery, with a return to see him in three months.[32]  On June 15, 2016, Dr. Kollman referred Plaintiff to Dr. Papachristou for a one-day surgery scheduled for August 2, 2016.[33] Dr. Papachristou had recommended that a glaucoma drainage device be placed in the left eye secondary to elevated IOP.[34]

On July 13, 2016, Dr. Kollman noted that Plaintiff was medically cleared for transfer secondary to an eye surgery consult.[35]

On or about July 28, 2016, Plaintiff was transferred from SCI Huntingdon to SCI Camp Hill.[36]

On August 1, 2016, Plaintiff signed a notice from Defendant Barbara Arentz, which stated that he was scheduled for a surgical procedure and would be admitted to the infirmary that day.[37]  Defendant Arentz is the clinical coordinator at SCI Camp Hill; she is not however, a health care provider.[38]  One of her responsibilities is to schedule off-site medical consultations for inmates at SCI Camp Hill.[39]  She knows that she should schedule a consultation when she receives an electronic authorization number for the consultation through the P-Track system.[40]  P-Track is a former

---

[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.* at 5.
[37] *Id.*
[38] Doc. 62-1 at 1.
[39] *Id.*
[40] *Id.*

system utilized for tracking consultation requests, authorizations, and appointments.[41]  In order for Defendant Arentz to obtain an authorization number for an off-site consultation, the consultation must be ordered by an on-site medical provider and then approved by the state medical director.[42]  Then, Defendant Arentz receives an authorization number and knows to schedule the consultation.  She can only schedule off-site treatment for inmates after it has been ordered by the on-site provider and authorized by the state medical director.[43]

The following day, August 2, 2016, Plaintiff underwent left eye glaucoma surgery with Dr. Papachristou at the Penn State Hershey Outpatient Surgery Center.[44]  Upon his return to the prison, Julian Gutierrez, M.D., noted that Plaintiff was status-post eye surgery at Hershey, that he had no complaints, and that he was using his eye drops as recommended.[45]

On the morning of August 3, 2016, Plaintiff reported to Shannon Quigley, R.N., that he was doing well.[46]  At noon that day, he stated that he was "ready to go" from the infirmary.[47]  He was in no apparent distress and without complications, so he was discharged.[48]  He had his eye shield on, and the nurse reviewed his drops

---

[41] *Id.*
[42] *Id.* at 2.
[43] *Id.*
[44] Doc. No. 59 at 5.
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*

including proper technique and directions for use as well as activity restrictions.[49] Later that day, Plaintiff went off-site for a follow-up appointment.[50] The ophthalmologist recommended activity restrictions, use of a shield over eye at bedtime, use of several different eye drops, and a return in one week.[51]

Plaintiff then returned to the off-site ophthalmologist on August 15, 2016.[52] The ophthalmologist recommended discontinuing Polytrim but otherwise continuing with the same drops and following-up in two to three weeks.[53] The same day, Dr. Gutierrez discontinued Plaintiff's prescription for Polytrim.[54] According to Plaintiff's medical records, a follow up appointment was never ordered or authorized.[55]

Plaintiff saw the on-site optometrist on August 17, 2016 for an exam and review of Plaintiff's medications and treatment plan.[56]

On September 12, 2016, Plaintiff reported white cloudiness and inability to see out of his left eye.[57] Judi Hamovitz, R.N., observed that Plaintiff's left eye sclera was slightly reddened and that there was a small bump to the left of his pupil in the

---

[49] *Id.*
[50] *Id.*
[51] *Id.* at 5-6.
[52] *Id.* at 6.
[53] *Id.*
[54] *Id.*
[55] Doc. 62-1 at 4.
[56] Doc. No. 59 at 6.
[57] *Id.*

corneal region, which Plaintiff reported was normal.[58]  He denied pain, dizziness, headaches, or seeing shadows. His gait was steady. The nurse referred him to the doctor for evaluation.[59]

The next day Plaintiff saw Vanitha Abraham, M.D., who noted that Plaintiff had glaucoma for many years.[60]  Plaintiff complained of vision loss, so Dr. Abraham referred him for a same-day off-site consult.[61]  The off-site ophthalmologist found that Plaintiff had bleeding of the left eye.[62]  He was to increase prednisone drops to every hour while awake, add Atropine twice daily, elevate the head of his bed to 45 degrees, wear a shield at night, and not to take aspirin or NSAIDs.[63]  It was also recommended that he return the following day.[64]

After his return to the prison on September 13, 2016, Plaintiff was put in the infirmary for 23-hour observation due to his restrictions, and the ophthalmologist's recommendations were ordered.[65]  Plaintiff denied any vision changes or pain later that day, and was using his eye drops.[66]  On the morning of September 14, 2016,

---

[58]   *Id.*
[59]   *Id.*
[60]   *Id.*
[61]   *Id.* at 6-7.
[62]   *Id.* at 7.
[63]   *Id.*
[64]   *Id.*
[65]   *Id.*
[66]   *Id.*

Plaintiff reported that he was good.[67]  He was able to administer his own eye drops with proper technique, and denied new or worsening symptoms.[68]

Plaintiff had another off-site ophthalmology consult that day.[69]  The ophthalmologist observed bleeding of the left eye post-glaucoma surgery.[70]  The plan was to continue all other drops but stop Dorzolamide, and he recommended returning in two weeks.[71]  He also recommended telephoning if his condition worsened, and tapering prednisolone from three times per day down to twice per day.[72]  Plaintiff was also examined by the on-site optometrist that day who found that Plaintiff's IOP was well-controlled at 16 in the right eye and 12 in the left.[73]  Dr. Gutierrez ordered the medication changed as recommended by the specialist.[74]  Plaintiff was discharged from the infirmary on September 15, 2016, with the restriction of no contact sports.[75]

On September 30, 2016, Plaintiff saw Dr. Gutierrez and asked why he had a medical hold.[76]  Dr. Gutierrez explained that an ophthalmology follow-up was needed and had been scheduled, and that Dr. Gutierrez wanted to see the

---

[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.*
[73] *Id.* at 7-8.
[74] *Id.* at 8.
[75] *Id.*
[76] *Id.*

ophthalmologist's recommendations before deciding on the medical hold.[77]  Plaintiff had no other complaints.[78]

Plaintiff went to a follow-up appointment with the off-site ophthalmologist, Dr. Papachristou, on October 3, 2016.[79]  The consultant recommended several medications and a return in one month.[80]  Dr. Gutierrez ordered the medications recommended by Dr. Papachristou that day.[81]  According to Plaintiff's medical records, the follow up appointment was never ordered or authorized.[82]

On October 18, 2016, Plaintiff saw Dr. Abraham for glaucoma follow-up.[83] She noted that his IOP was down to 7, and he had another ophthalmology appointment coming up.[84]

Plaintiff had an on-site ophthalmology consultation with Scott Hartzell, M.D., on November 1, 2016, secondary to glaucoma.[85]  His right IOP was 10 and left IOP 5.[86]  It was recommended that he continue Latanoprost drops in both eyes nightly

---

[77]  *Id.*
[78]  *Id.*
[79]  *Id.*
[80]  *Id.*
[81]  *Id.*
[82]  Doc. 62-1 at 4.
[83]  Doc. No. 59 at 8.
[84]  *Id.*
[85]  *Id.*
[86]  *Id.*

and Timolol Maleate drops in the right eye twice per day.[87]  It was also recommended that he have an IOP check in one month.[88]

On November 21, 2016, Dr. Gutierrez entered an order discontinuing Plaintiff's medical hold.[89]

Plaintiff saw on-site ophthalmologist, Dr. Hartzell, on January 4, 2017.[90]  His IOP was 13 in the right and 12 in the left.[91]  He was directed to continue Latanoprost drops in both eyes nightly, Timolol Maleate drops in the right eye twice per day, and to follow-up in 3-4 months.[92]

On or about January 5, 2017, Plaintiff was transferred back to SCI Huntingdon.[93]  In his transfer reception screening, it was noted that Plaintiff has limited vision in the left eye; however, he was medically cleared for routine housing, employment, food handling, and activities.[94]

On January 6, 2017, Plaintiff reported that he was unhappy about not seeing the off-site ophthalmologist since October 2016.[95]  Michael Gomes, PA-C, reviewed Plaintiff's case with the doctor and noted that there was no indication for referral to

---

[87]  *Id.* at 8-9.
[88]  *Id.* at 9.
[89]  *Id.*
[90]  *Id.*
[91]  *Id.*
[92]  *Id.*
[93]  *Id.*
[94]  *Id.*
[95]  *Id.*

off-site ophthalmology unless deemed necessary by Institutional Eye Care ("IEC"), the providers of on-site eye care.[96]

Plaintiff underwent a visual acuity test on January 13, 2017.[97]  That day, he complained of more persistent left eye pain, worsening flashers, and narrowing of visual field in his left eye over the course of one week.[98]  On exam, his pupillary response test was normal, and extraocular movements ("EOMs") were intact.[99] There was no conjunctivitis.[100]  Mr. Gomes discussed the case with the doctor, conducted patient education, and requested an ophthalmology referral.[101]

Plaintiff then saw off-site ophthalmologist Christopher J. Patitsas, M.D., on January 18, 2017, because of his complaints of light flashes and some pain in the left eye.[102]  Dr. Patitsas opined that Plaintiff had stable combined mechanism glaucoma of the right eye, poor control of combined mechanism glaucoma of the left eye, and poor ability to view the fundus in the left eye.[103]  He recommended continuing Timolol and Latanoprost drops, returning in three to four weeks for follow-up, and following up with Dr. Papachristou.[104]

---

[96]  *Id.*
[97]  *Id.* at 10.
[98]  *Id.*
[99]  *Id.*
[100]  *Id.*
[101]  *Id.*
[102]  *Id.*
[103]  *Id.*
[104]  *Id.*

Plaintiff complained of left eye redness with some lid swelling and drainage, but without pain, on January 31, 2017.[105]  Michael Gomes opined that Plaintiff had left conjunctivitis.[106]  He was to start erythromycin ointment.[107]  He was also to follow-up in three days.[108]  On February 3, 2017, the conjunctivitis was resolving.[109]

Plaintiff returned to see Dr. Patitsas on February 16, 2017.[110]  Dr. Patitsas noted improved control of Plaintiff's glaucoma in both eyes, and a cataract limiting vision in the left eye.[111]  He was to continue with drops, and Dr. Patitsas planned to speak to Dr. Papachristou about the advisability of left eye extracapsular cataract extraction ("ECCE") and intraocular lens implantation ("IOL").[112]  He recommended return in three weeks.[113]

Plaintiff saw Dr. Patitsas again on March 10, 2017.[114]  Dr. Patitsas noted right eye glaucoma, with multiple peripheral anterior synechiae, danger or angle closure, and cataract limiting vision in left eye.[115]  He recommended YAG laser peripheral

---

[105] *Id.*
[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] *Id.* at 11.
[110] *Id.*
[111] *Id.*
[112] *Id.*
[113] *Id.*
[114] *Id.*
[115] *Id.*

iridotomy ("LPI") in the right eye, and ECCE/IOL in the left eye.[116]  He discussed the risks and benefits with Plaintiff, who agreed to proceed with surgery.[117]

On April 4, 2017 Plaintiff underwent right eye surgery (YAG LPI procedure) with Dr. Patitsas.[118]  Several drops were recommended, and Plaintiff was to return the following day.[119]  He duly returned on April 5, 2017.[120]  He was to continue Xalatan and Timolol drops, and use Pred Forte drops for six days.[121]  He was to return for a follow-up in one to two weeks.[122]

On April 11, 2017, Plaintiff had an on-site ophthalmology consult with Dr. Hartzell.[123]  His right eye IOP was 15, and left IOP 12.[124]

Plaintiff saw Dr. Patitsas again on April 17, 2017.[125]  Dr. Patitsas noted resolved right eye uveitis glaucoma.[126]  It was recommended that he continue the same drops and return for the ECCE/IOL procedure to the left eye.[127]

Plaintiff had left eye cataract surgery (ECCE/IOL procedure) on May 9, 2017, which he tolerated well.[128]  In the operative note, Dr. Patitsas noted preoperative

---

[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] *Id.*
[120] *Id.* at 12.
[121] *Id.*
[122] *Id.*
[123] *Id.*
[124] *Id.*
[125] *Id.*
[126] *Id.*
[127] *Id.*
[128] *Id.*

diagnosis of cortical cataract, and secondary diagnoses of end-stage combined mechanism glaucoma; with history of failed glaucoma filter and successful tube shunt in the left eye; and a left, extremely miotic pupil, which made examination of the ocular fundus and ocular nerve disc almost impossible.[129] Plaintiff was admitted to the infirmary upon his return to the prison.[130]

On May 10, 2017, Plaintiff saw Dr. Patitsas for a post-operative appointment.[131] Dr. Patitsas noted that he was stable.[132] Several medications were recommended, and Plaintiff was to avoid lifting, bending, or stooping; wear sunglasses during the day; and wear a protective patch over the left eye at bedtime.[133] On May 12, 2017, Dr. Patitsas noted "nice results" in Plaintiff's left eye.[134] He was to return in a week.[135]

Plaintiff saw Dr. Patitsas again on May 19, 2017.[136] He again noted nice results in the left eye and recommended several drops for both eyes.[137] On June 2, 2017, Plaintiff again saw Dr. Patitsas in follow-up.[138] He continued to note good

---

[129] *Id.*
[130] *Id.*
[131] *Id.* at 13.
[132] *Id.*
[133] *Id.*
[134] *Id.*
[135] *Id.*
[136] *Id.*
[137] *Id.*
[138] *Id.*

results in the left eye and recommended several drops.[139]  He also recommended

following up with him or another ophthalmologist in a month.[140]

On or about June 13, 2017, Plaintiff was received at SCI-Mahanoy from SCI-

Huntingdon as a permanent transfer.[141]  The records show that Plaintiff continued to

treat with both on-site and off-site ophthalmology for his glaucoma, and that his IOP

remained controlled.[142]

## II.     STANDARD OF REVIEW

Summary judgment should be granted when the pleadings, depositions,

answers to interrogatories, admissions on file, and affidavits show that there is no

genuine dispute as to any material fact and that the moving party is entitled to a

judgment as a matter of law.[143]  A disputed fact is material when it could affect the

outcome of the suit under the governing substantive law.[144]  A dispute is genuine if

the evidence is such that a reasonable jury could return a verdict for the nonmoving

party.[145]  The Court should view the facts in the light most favorable to the non-

---

[139]   *Id.*
[140]   *Id.*
[141]   *Id.*
[142]   *Id.*
[143]   Fed. R. Civ. P. 56(c).
[144]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[145]   *Id.* at 250.

moving party and make all reasonable inferences in that party's favor.[146]  When the non-moving party fails to refute or oppose a fact, it may be deemed admitted.[147]

Initially, the moving party must show the absence of a genuine issue concerning any material fact.[148]  Once the moving party has satisfied its burden, the non-moving party, "must present affirmative evidence in order to defeat a properly supported motion for summary judgment."[149]  "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla."[150]  "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c)," a court may grant summary judgment or consider the fact undisputed for purposes of the motion.[151]

If the court determines that "the record taken as a whole could not lead a rational trier or fact to find for the non-moving party, there is no 'genuine issue for trial.'"[152]  Rule 56 mandates the entry of summary judgment against the party who

---

[146]  *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).
[147]  *See* Fed. R. Civ. P. 56(e)(2); Local R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.").
[148]  *See Celotex Corp. v. Carrett*, 477 U.S. 317, 323 (1986).
[149]  *Anderson*, 477 U.S. at 257.
[150]  *Hugh*, 418 F.3d at 267 (citing *Anderson*, 477 U.S. at 251).
[151]  Fed. R. Civ. P. 56(e)(2)-(3).
[152]  *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.[153]

Plaintiff has filed an opposition to Defendant's statement of facts, and while he does dispute some of those facts, he has also failed to dispute any of the facts material to the disposition of his Eighth Amendment medical claim.   As such, summary judgment is appropriate here.

## III.   DISCUSSION

In support of her motion, Defendant Arentz argues that she was not personally involved in denying or delaying Plaintiff's access to healthcare, or interfering with prescribed treatment for nonmedical reasons because she is merely an administrator; her job is to schedule off-site services only after the on-site, treating healthcare providers have ordered her to do so.

Plaintiff has brought his Eighth Amendment constitutional claim pursuant to 42 U.S.C. § 1983, which provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

---

[153] *Celotex Corp.*, 477 U.S. at 322.

"To establish a claim under 42 U.S.C. § 1983, [a plaintiff] must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law."[154]  "The first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'"[155]

"In order to state a cognizable [medical] claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment."[156]  "[T]o succeed under these principles, plaintiffs must demonstrate (1) that the defendants were deliberately indifferent to their medical needs and (2) that those needs were serious."[157]  This standard affords considerable latitude for medical professionals within a prison to diagnose and treat the medical problems of inmate patients.[158]  Some of the more common situations in which "deliberate indifference" has been found include when the defendant knows of a prisoner's need for medical treatment but intentionally refuses to provide it,

---

[154] *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993).

[155] *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).

[156] *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

[157] *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

[158] *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979); *Little v. Lycoming County*, 912 F. Supp. 809, 815 (M.D. Pa. 1996).

delays necessary medical treatment based on a non-medical reason, and prevents a prisoner from receiving needed or recommended medical treatment.[159]

In addition, "[a] defendant in a civil rights action 'must have personal involvement in the alleged wrongs to be liable,' and 'cannot be held responsible for a constitutional violation which he or she neither participated in nor approved.'"[160] Furthermore, supervisory liability cannot be imposed under § 1983 by *respondeat superior*.[161] "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."[162] A plaintiff must show that an official's conduct caused the deprivation of a federally protected right.[163] In addition, a prisoner's allegation that prison officials and administrators responded inappropriately or failed to respond to a prisoner's complaint or an official grievance does not establish that the officials and administrators were involved in the underlying allegedly unconstitutional conduct.[164]

---

[159] *Id.*

[160] *Baraka v. McGreevey,* 481 F.3d 187, 210 (3d Cir. 2007). *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

[161] *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978); *Rizzo v. Goode*, 423 U.S. 362 (1976); *Durmer v. O'Carroll*, 991 F.2d 64, 69 n.14 (3d Cir. 1993).

[162] *Iqbal*, 556 U.S. at 677.

[163] *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Gittlemacker v. Prasse*, 428 F.2d 1, 3 (3d Cir. 1970) (A plaintiff "must portray specific conduct by state officials which violates some constitutional right.").

[164] *See Rode*, 845 F.2d at 1207-08 (concluding that review of a grievance is insufficient to demonstrate the actual knowledge necessary to establish personal involvement); *Pressley v. Beard*, 266 F. App'x 216 (3d Cir. 2008) (prison officials cannot be held liable solely based on their failure to take corrective action when grievances or investigations were referred to them); *Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006); *Croom v. Wagner*, No. 06-1431, 2006 WL 2619794, at *4 (E.D. Pa. Sept. 11, 2006) (holding that neither the filing of a

Here, judgment is proper in favor of Defendant Arentz as a matter of law because the undisputed facts demonstrate that she is not a healthcare provider and lacks the authority to order medical treatment or off-site appointments without the authorization of a prison healthcare provider.  She ordered all appointments and care authorized by the healthcare providers while Plaintiff was at SCI Camp Hill, and she had no personal involvement in the decision not to authorize the two follow up appointments that Plaintiff did not receive and, apparently, concludes that he should have.

Additionally, it was reasonable for Defendant Arentz to rely on the medical treatment and discretion provided to Plaintiff, who was under the treatment of numerous doctors both at SCI Camp Hill and off-site.  As Defendant Arentz points out, a non-physician such as an administrator is not deliberately indifferent "simply because they failed to directly respond to the medical complaints of a prisoner who was already being treated by the prison doctor."[165]  Rather, "[i]f a prisoner is under the care of medical experts, . . . a non-medical prison official will generally be

---

grievance nor an appeal of a grievance is sufficient to impose knowledge of any wrongdoing); *Ramos v. Pennsylvania Dep't of Corrs.*, No. 06-cv-1444, 2006 WL 2129148, at *2 (M.D. Pa. July 27, 2006) (holding that the review and denial of the grievances and subsequent administrative appeal does not establish personal involvement).

[165] *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993).

justified in believing that the prisoner is in capable hands."[166]  The same can be said here.

Plaintiff received continued and comprehensive treatment for his eye ailments, and the Court can discern no deliberate indifference by Defendant Arentz. For these reasons, the Court will grant the motion for summary judgment.

## IV.   CONCLUSION

Based on the foregoing, the motion for summary judgment will be granted, and judgment entered in favor of Defendant and as against Plaintiff.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[166] *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).  *See also Pearson v. Prison Health Serv*., 850 F.3d 526, 540 n.4 (3d Cir. 2017) (nurse who knows that an inmate is under a physician's care and has no reason to believe the physician is mistreating the inmate is not liable); *Newton v. Reitz*, No. 07-cv-12542009 WL 233911, at *5 (M.D. Pa. Jan. 30, 2009) (dismissing claim against health services administrator and noting that "the Third Circuit held in *Durmer* that a non-physician defendant cannot be held liable for being deliberately indifferent to an inmate's medical needs where, as here, the inmate is receiving treatment from the institution's health care staff.").